J. W. MORRIS, Appellant (Defendant below),

v.

STATE of Indiana, Appellee (Plaintiff below).

No. 779S183.

Supreme Court of Indiana.

Jan. 29, 1980.

Rehearing Denied April 9, 1980.

Irma Hampton Nave, Anderson, for appellant.

Theodore L. Sendak, Atty. Gen., Stephen J. Cuthbert, Deputy Atty. Gen., Indianapolis, for appellee.

HUNTER, Justice.

Defendant, J. W. Morris, was convicted by a jury of murder, Ind.Code § 35–42–1–1 (Burns 1979 Repl.), and sentenced to forty years' imprisonment. He now appeals raising several issues. However, because of our disposition of defendant's Fourth Amendment claim, we need consider only that issue.

■ In the early morning, November 25, 1978, David Upton, III, was shot and killed near his home in Muncie, Indiana. Prior to the shooting, a shotgun blast was discharged in the direction of a window to a bedroom of Upton's house in which defendant's father was staying. At approximately 2:00 a. m., Muncie police picked up defendant for questioning. At that time police did not know whether defendant was the perpetrator of the crime or a witness. Deputy Chief LeRoy Hahn testified that defendant

"was one of the subjects we had reason to believe that may or may not have been in the area. And I wanted a statement from him as to where he was at, his actions and so forth."

In fairness to the state, it appears that on this occasion defendant voluntarily accompanied police to the police station for questioning. Another Muncie police officer, Steven Stanley, in response to defense counsel's questioning, testified in the following manner:

Q. "You didn't advise him of his right not to even go with you?"

A. "Who?"

Q. "My client?"

A. "Yes I did ma'am, inside the house. I advised him that he was going of his own free will and he didn't have to go if he didn't want to."

Q. "Did you tell him he didn't have to talk to you?"

A. "I didn't ask him any questions. I just ask [sic] the man if [he] would accompany me of his own free will to talk to Detectives."

Although defendant was at the police station for nearly three hours before being questioned and up to seven hours total, he

did not give an inculpatory statement. Therefore, any Fourth Amendment violation by Muncie police associated with defendant's first trip to the police station had, in and of itself, no effect on the trial. Besides, defendant's statement indicates he voluntarily accompanied the police.

■ However, the very next morning police picked up defendant for questioning again. The state, in its brief, states only that "defendant was transported to the police station again." The record does not indicate that this trip was voluntary. The examination of Sergeant Shane McClellan included the following:

Q. "He was picked up by the police department and brought down there?"

A. "He was picked up by 2 investigators, yes."

There is no testimony as to what was said to defendant at the time he was picked up the second time. However, Sergeant McClellan stated:

"And when we met the next morning that's when we decided to pick J. W. and Dana up, John Jones up, [to] reinterview them about the statements that had already been made."

This statement indicates that the decision to bring defendant J. W. Morris in was made by the police and was not a voluntary decision made by defendant. Within three hours of his arrest[1] defendant signed a rights waiver, made inculpatory statements and led police to physical evidence. Defendant was then placed in jail. The next day at approximately 11:00 a. m., defendant asked to talk to another police officer and modified his previous statement, placing more blame on his alleged accomplice.

At no time during the above events did police have an arrest warrant. Prior to

[1] At trial the state was careful not to characterize defendant's detention as an arrest. The United States Supreme Court has addressed this point:

"[T]he detention of petitioner was in important respects indistinguishable from a traditional arrest. Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in

an interrogation room. He was never informed that he was 'free to go'; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody." *Dunaway v. New York* (1979) 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824, 835–6. While there is no evidence here that defendant would have been restrained, neither is there any evidence that he was free to go.

defendant's second statement there is no indication that the police had probable cause to obtain an arrest warrant. Indeed the evidence reveals that police used the arrest and detention of defendant as an investigatory tool. Again we quote from the testimony of Sergeant McClellan:

Q. "Was he under arrest at that time?"

A. "He was advised he was a suspect."

Q. "But was he under arrest?"

A. "He hadn't been charged."

Q. "Did you have any grounds for charging him at that time he signed the rights waiver?"

A. "The investigation was still on and going at that time."

Q. "Okay. Did you ask him if he understood that?"

A. "Yes."

Q. "What did he say."

A. "He did. He knowed that he did by signing it."

\* \* \* \* \* \*

Q. "I believe you stated . . . I guess it would be on cross-examination by Mr. Alexander, that you considered J. W. Morris a suspect. I believe those are the words you used."

A. "I think I probably said that. I wasn't happy with the investigation and the statements that had already been taken, that's the reason why and the information that I'd gained, I felt like yes he was a suspect."

\* \* \* \* \* \*

Q. "At the time he was arrested did you have an arrest warrant?"

A. "No."

Q. "Did you attempt to get an arrest warrant?"

A. "No."

Q. "Why not?"

A. "Case was still under investigation."

A warrantless arrest not supported by probable cause is unlawful. *Morgan v. State* (1926) 197 Ind. 374, 151 N.E. 98.

■ The evidence is not in dispute regarding the proper advisement of defendant's rights under *Miranda v. Arizona* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, prior to all questioning in this case. However, even if a confession is voluntary under the Fifth Amendment and *Miranda* and its progeny, that confession must be suppressed if it is the product of an unlawful arrest or detention. *Brown v. Illinois* (1975) 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416; *Williams v. State* (1976) 264 Ind. 664, 348 N.E.2d 623.

In *Brown v. Illinois, supra,* the United States Supreme Court was unanimous in the conclusion that the Illinois Supreme Court was incorrect in holding that *Miranda* warnings, per se, rendered the defendant's statements admissible. Rather, when an arrest is unlawful, as in the case at bar, the Supreme Court will look to whether any subsequent statement or production of evidence "was sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States* (1963) 371 U.S. 471, 486, 83 S.Ct. 407, 416–7, 9 L.Ed.2d 441, 454. Justice Brennan framed the issue in *Wong Sun* as follows:

"the more apt question in such a case is 'Whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455.

Justice Blackmun, writing the opinion of the Court in *Brown v. Illinois, supra,* indicated that in rejecting the Illinois Court's per se rule, the Supreme Court would not adopt a per se or "but for" rule of its own.

"The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a

talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant." 422 U.S. at 603–4, 95 S.Ct. at 2261–2, 45 L.Ed.2d at 427. [Citations and footnotes omitted.]

The facts in the *Brown* case are remarkably similar to those in the case at bar. Brown gave his first statement less than two hours after the unlawful arrest and there were no intervening circumstances of significance. Furthermore, the Court noted:

"The illegality here, moreover, had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was 'for investigation' or for 'questioning.' . . . The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion. 422 U.S. at 605, 95 S.Ct. at 2262, 45 L.Ed.2d at 428.

■ In this case, defendant J. W. Morris turned over evidence and gave an inculpatory statement, all within three hours of his arrest on November 26, 1978.[2] The arrest was made with neither a warrant nor probable cause. There were no intervening circumstances of significance between the arrest and production of evidence and statement. There was no "quality of openness" about defendant's detention and defendant had no contact with the outside world as in

*Fortson v. State* (1979) Ind., 385 N.E.2d 429. We are cognizant

"that a distinction should be made between flagrant violations by the police, on the one hand, and technical, trivial, or inadvertent violations, on the other." *Brewer v. Williams* (1977) 430 U.S. 387, 414n, 97 S.Ct. 1232, 1247n, 51 L.Ed.2d 424, 446n. (Justice Marshall concurring.)

But the violations by the police in this case are not technical or trivial, but rather, as in *Brown*, the violations had a "quality of purposefulness." Concerning the purpose of the interrogation of defendant when he voluntarily accompanied police, Deputy Chief Hahn testified, "Yes, we were pursuing an investigation, that's what we were all there for." Sergeant McClellan indicated that investigation was the purpose of defendant's arrest on November 26.

■ The burden of showing admissibility of evidence rests with the state. *Brown v. Illinois, supra.* We find that the state failed to carry that burden in this case.

■ Defendant has challenged the admissibility of physical evidence, shotgun parts and a bag, as well as the statements. The United States Supreme Court rejected any distinction between physical and verbal evidence under the exclusionary rule in *Wong Sun, supra.* The rule of *Brown v. Illinois* is clearly applicable to physical evidence. See *United States v. Watson* (1976) 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 and *Gamble v. State of Oklahoma* (10th Cir. 1978) 583 F.2d 1161.

The state claims the shotgun was admissible because "the evidence reveals that defendant, himself, took the officers to his back yard and produced the evidence and gave it to them." The state does not point to the portion of the record which supports this statement. Our search of the record yields only the following evidence of the trip to defendant's residence.

Q. "Okay. Now between the time the rights waiver was signed and the time the statement was taken, was J.

2. A three-hour detention was not sufficient to purge the primary taint of the unlawful arrest

in *United States v. Perez-Esparza* (9th Cir. 1979) 609 F.2d 1284.

W. Morris continuously at police headquarters or was there a time when he left?"

A. "No sir we left with J. W. Morris."

Q. "Okay, who is 'we'?"

A. "[Sergeant] Gene Hayden and myself."

Q. "And where did you go?"

A. "We went to J. W.['s] house.

\* \* \* \* \* \*

Q. "Okay and what did you do there?"

A. "We drove down the alley to the rear of the property and we recovered a shotgun which was in a doghouse behind some pile of wood."

Q. "When you say 'we recovered' who physical [sic] went and got it?"

A. "J. W. Morris."

Q. "How did you know to go there in the first place?"

A. "J. W. Morris told us where the gun was."

It appears from this portion of the record and from the custom of the Muncie police in this case that defendant, while in police custody, was driven to his home by the police in a police squad car. Furthermore, the above testimony indicates that the knowledge of the location of the physical evidence was the fruit of verbal communications of defendant made during his unlawful detention. Again the state failed to carry its burden of showing the admissibility of the evidence.

The trial court erred in admitting into evidence state's exhibits 3, 4, 5, 6, C, N, O, P and Q, in denying defendant's motion to suppress said exhibits and in overruling defendant's objections with regard thereto. For this reason, the judgment of the trial court is reversed and the cause is remanded with instructions to grant defendant a new trial to be conducted in a manner not inconsistent with this opinion.

Judgment reversed and cause remanded.

DeBRULER and PRENTICE, JJ., concur.

GIVAN, C. J., dissents with opinion in which PIVARNIK, J., concurs.

GIVAN, Chief Justice, dissenting.

I respectfully dissent from the majority opinion that officers had no probable cause to arrest the appellant on November 26, 1978. At page 742 of the majority opinion there is a quotation from the examination of Sergeant McClellan as to the appellant's arrest on November 26. However, close examination of this entire testimony, as found in the transcript beginning at page 246, discloses that Officer Shane McClellan was not in on the initial investigation of the crime, but came into the investigation at about 10:00 a. m. on the morning of November 26. He stated that he was not satisfied with the reports he read of the investigation up to that point and that he and other officers decided they should talk to the appellant, J. W. Morris, his brother, Dana Morris and one, Johnny Ray Jones, once more. He pointed out in his testimony that in addition to those three persons, eight other persons had been questioned at police headquarters concerning the facts of the night before. It was during this further questioning, on the morning of the 26th, that it finally became apparent to police officers, based upon statements made by the appellant himself, that the appellant was a prime suspect in the case. It was at that time, from Officer McClellan's point of view, that appellant was placed under arrest. However, more important to the issues in this case, is the question of when the Muncie police officers actually obtained evidence which could be considered to be probable cause for the arrest of the appellant.

An overall examination discloses that on the night of the shooting, police officers first investigating the case discovered that a window had been shot out of a house by shotgun blast a short distance from where the victim of the crime had been killed by a shotgun. Upon making investigation at the house where the window had been shot out, police learned that one Hugh Morris, father of the appellant, was residing there at the time and that on a prior occasion appellant had broken the windows out of Hugh Morris' automobile. Further investigation

showed that a short time before the shooting appellant, asked to talk with Hugh Morris but was refused that opportunity. Hugh Morris told police officers that he suspected his son as being the one who shot out the window with a shotgun belonging to Hugh Morris. Hugh Morris then went with police officers to the home where appellant was staying in an attempt to recover the shotgun. A shotgun was recovered that night, but turned out not to be the one used in the killing.

Unfortunately, this record does not contain all of the evidence obtained by the police officers that night in their interview of the eight persons in addition to the three suspects, but contains only the conclusion of officers that after conducting such interviews they came to the conclusion that J. W. Morris, Dana Morris and John Jones were suspects. However, notwithstanding the confusion as to exactly when appellant J. W. Morris was arrested, if we presume for the sake of argument that he was arrested when taken into custody a little after 10:00 on the morning of the 26th of November, the police officers at that time had ample evidence from which the trial judge could logically deduce that there was probable cause for the arrest of the appellant. The statements of appellant's father alone, to the police officers on the night of the shooting would constitute ample evidence of such probable cause. The mere fact that appellant was one of at least 11 people who were talked to by various police officers on the night of the shooting and was allowed to remain at large following that first interview, does not detract from the fact that once police officer reassembled at police headquarters and discussed their collective information in the matter, they came to the conclusion they had probable cause for the arrest of the appellant. This becomes apparent from the testimony of Officer Shane McClellan, found in the transcript at page 265.

Furthermore, the case at bar is a far cry, factually, from the cases cited in the majority opinion, for the proposition that a warrantless arrest without probable cause requires the suppression of all evidence obtained as a result of that arrest. In those cases the conviction turns upon the evidence received in such a manner. In the case at bar, although there was evidence by way of a shotgun which was obtained as a result of the arrest, as well as an inculpatory statement made by the appellant, which one might say was the result of the arrest, the evidence actually presented to the jury far exceeded the evidence obtained as a result of the arrests. The co-defendant John Jones testified in detail as to the happenings on the night of the killing, implicating both himself and the appellant. Appellant's wife also testified in detail concerning a conspiracy between appellant, Jones, Dana Morris and appellant's mother, to kill appellant's father. She also stated that after the shooting appellant, Jones and Dana all returned to the house, after which she learned they had shot the decedent. Appellant himself testified at his own trial, contradicting the statement he made on the 26th of November, stating at the trial that it was in fact Jones who had done the shooting and not the appellant, although he admitted freely that he had accompanied Jones on the night of the shooting. The appellant's brother Dana also testified that he was present when the shooting occurred but backed up the appellant in stating that it was Jones who did the shooting. He freely admitted that his brother, the appellant, was present, at the time. In his testimony the appellant attempted to convey the idea to the jury that although he was present during the time of the shooting, the conspiracy actually did not include him but was between Jones and appellant's mother and that he did not really realize what Jones was attempting to do on the night of the killing. If one completely disregards all evidence obtained as a result of appellant's arrest, there is still more than ample evidence in this record to sustain the decision of the trial court.

In summation, there is no question but what the record contains ample evidence from which the trial judge could determine there was probable cause for the arrest of the appellant on November 26, 1978.

Therefore the evidence obtained as a result of the questioning following such arrest was admissible. I therefore would not reverse this case on that point of law.

PIVARNIK, J., concurs.