Phillip L. BARBER,
Appellant-Defendant,

v.

STATE of Indiana, Appellee-Plaintiff.

No. 2–880A291.

Court of Appeals of Indiana,
Fourth District.

April 13, 1981.

Manuel P. Guerrero, Marion, for appellant-defendant.

Linley E. Pearson, Atty. Gen., Kathleen G. Lucas, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

CHIPMAN, Judge.

Defendant Phillip Lee Barber was convicted by a jury of the September 6, 1979, robbery[1] of a Marion, Indiana clothing store. Barber now appeals that conviction raising the following issues for our review:

1) whether the trial court properly admitted the defendant's confession,

2) whether the trial court erred by admitting an amended transcript of the defendant's statement, and

3) whether there was sufficient evidence to support the robbery conviction.

We affirm.

I. Admissibility of Confession

On September 11, 1980, Marion police transported defendant Barber to police headquarters for questioning. There he admitted to his involvement in the robbery for which he stands convicted. Barber concedes he was read the warnings required by *Miranda v. Arizona,* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and he does not seek to challenge the voluntariness of his statement for Fifth Amendment purposes. Instead, defendant argues he was arrested without probable cause, and therefore his confession, being the product of an unlawful detention, was inadmissible under *Dunaway v. New York,* (1979) 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824. The State argues Barber voluntarily accompanied the police to headquarters for questioning and therefore no arrest occurred.

The Fourth Amendment to the U.S. Constitution guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures . . . ." Generally, for an arrest or seizure of the person to be reasonable, it must be based upon probable cause. *Brinegar v. United States,* (1949) 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879.[2] In *Brown v. Illinois,* (1975) 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416, and *Dunaway v. New York, supra,* the U.S. Supreme Court held that a confession, otherwise voluntary for Fifth Amendment purposes, is inadmissible when the defendant's statement is obtained by exploitation of an illegal arrest. Both *Brown* and *Dunaway* have been followed in this state. See *Morris v. State,* (1980) Ind., 399 N.E.2d 740; *Williams v. State,* (1976) 264 Ind. 664, 348 N.E.2d 623.

Obviously, not every police-citizen encounter amounts to a "seizure" of the person. In *Terry v. Ohio,* (1968) 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, Chief Justice Warren set out a test for determining whether a person has been "seized" for Fourth Amendment purposes:

"Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

392 U.S. at 19, n. 16, 88 S.Ct. at 1879, n. 16. The *Terry* definition of "seizure" was refined somewhat in the recent case of *U. S. v. Mendenhall,* (1980) 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497.

One issue in *Mendenhall* was whether Ms. Mendenhall was arrested or seized when Drug Enforcement Administration officers asked her to accompany them to the DEA office at the Detroit airport for questioning. In Part II-A of his plurality opinion, Justice Stewart wrote:

of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Id.* at 27, 88 S.Ct. at 1883.

The defendant's encounter with police in the present case obviously transcends the brief, on-the-spot investigatory stop and frisk dealt with in *Terry.*

---

1. Ind.Code 35–42–5–1.

2. The case of *Terry v. Ohio,* (1968) 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 for the first time recognized a narrow exception to the rule that all Fourth Amendment seizures must be based upon probable cause. The court viewed the "stop and frisk" in *Terry* as only a limited violation of individual privacy and established "a narrowly drawn authority to permit a reasonable search for weapons for the protection

"We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."

446 U.S. at 554, 100 S.Ct. at 1877.[3] Stewart concluded there was evidence to show Mendenhall had voluntarily cooperated with the government agents and therefore no seizure or arrest occurred. This conclusion was not altered by the fact Mendenhall was not expressly told by the DEA officers that she was free to decline to cooperate with their inquiry. *Id.* at 555, 100 S.Ct. at 1877. Stewart also reasoned that the intent of the officers, i. e. whether they would have restrained Mendenhall had she attempted to leave, was relevant only if that intent was conveyed to the defendant. *Id.* at 554, n. 6, 100 S.Ct. at 1877.

While the court's reasonable man test for a Fourth Amendment seizure in *Mendenhall* is ostensibly an objective one, it quite clearly retains a subjective element. For instance, Mendenhall argued that her encounter with the government agents was coercive because of her race, lack of education, sex, her relatively young age, and the presence of white male officers. Justice Stewart found these factors were "not irrelevant, see *Schneckloth v. Bustamonte, supra* [412 U.S. 218] at 226 [93 S.Ct. 2041 at 2047, 36 L.Ed.2d 854] [but] neither were they decisive, and the totality of the evidence . . . was plainly adequate to support the District Court's finding that the respondent voluntarily consented to accompany the officers to the DEA office." 446 U.S. at 558, 100 S.Ct. at 1879.

■ We conclude that when determining whether a seizure of the person has occurred for Fourth Amendment purposes, the appropriate inquiry should be whether, considering all the circumstances surrounding the police-citizen encounter, the defendant entertained a reasonable belief that he was not free to leave.[4] Furthermore, as a court of review we are limited to a determi-

---

3. Only Justice Rehnquist joined in Part II–A of Justice Stewart's opinion. In a concurring opinion joined in by the Chief Justice and Justice Blackmun, Justice Powell stated he did not reach the question whether Ms. Mendenhall had been "seized" by the government agents because neither the Federal District Court nor the Court of Appeals considered the question. 446 U.S. at 560, 100 S.Ct. at 1880. While it is not clear whether Powell agreed with the conclusion that Mendenhall had not been seized, it does appear Powell agreed with Justice Stewart's formulation of the test for determining whether a Fourth Amendment "seizure" has occurred:

"Mr. Justice Stewart concludes in Part II–A that there was no 'seizure' within the meaning of the Fourth Amendment. He reasons that such a seizure occurs 'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' *Ante,* at 8. * * * I do not necessarily disagree with the views expressed in Part II–A. For me, the question whether the respondent in this case, reasonably could have thought she was free to 'walk away' when asked by two

government agents for her driver's license and ticket is extremely close."
Id. at 560, n. 1, 100 S.Ct. at 1880.

4. A similar but somewhat less precise definition of "arrest" has evolved in Indiana. Ind. Code 35 1–19–1 provides that "[a]n arrest is made by an actual restraint of the person of the defendant, *or by his submission to the custody of the officer* . . . ." (emphasis added) See *Dillon v. State,* (1971) 257 Ind. 412, 275 N.E.2d 312; *Cook v. State,* (1980) Ind.App., 403 N.E.2d 860; *State v. Hummel,* (1977) Ind.App., 363 N.E.2d 227, *cert. denied* 436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 403. Our Supreme Court stated in *Peterson v. State,* (1968) 250 Ind. 269, 234 N.E.2d 488, that anytime police "interrupt the freedom of an accused and restrict his liberty of movement, an arrest has been effected." 234 N.E.2d at 490. As the court noted in *Bryant v. State,* (1973) 157 Ind.App. 198, 299 N.E.2d 200, "[t]he important point is not the nomenclature used to describe the activity, i. e., 'stop and frisk', or 'investigatory detention', or 'arrest', etc. The important point is that the Fourth Amendment applies whenever a person is 'seized.'" 299 N.E.2d at 204.

nation of whether there was sufficient evidence to support the trial court's conclusion on this issue.

Turning to the facts of the present case, the evidence shows that on September 11, 1979, Marion police received a tip from the defendant's mother that the house where she and her son lived might contain stolen property. The defendant was placed under surveillance for a short period of time that day. Later in the day an unmarked police car driven by detective Paul Biddle pulled up to the curb beside the defendant as he was walking towards his home. Biddle exited the automobile and identified himself by displaying his badge. The detective told defendant Barber that police were investigating several robberies in the community. he then asked the defendant, "Would you come downtown to talk to Captain Mowery?" Defendant Barber knew Mowery and had provided Mowery with information on previous occasions. Detective Biddle and the defendant walked a short distance to the defendant's home, where other police officers were present talking to the defendant's mother and preparing to undertake a search of the premises with her consent.[5] Defendant Barber told detective Biddle he would answer questions at the police station, but wanted to change his clothes first. With the defendant's consent, two detectives entered the house to wait inside. From where the men stood they were able to observe the defendant change clothes in the bedroom.

After the defendant changed, he was told that officer Sorrell could drive him to the police station. The defendant walked to Sorrell's marked police car, opened the front passenger door, and entered the front seat. Only officer Sorrell and the defendant rode in the squad car to the station. Other officers remained at the scene to complete their search.

Once at the station, defendant Barber was led to a room in the rear of the building. He was served coffee. After Barber waited alone in the room for approximately ten minutes, Captain Mowery and two oth-er detectives entered. Mowery proceeded to ask the defendant whether he knew anything about several robberies in the community. Eventually Barber interrupted Mowery and told him he knew about the robbery of the Marion Bargain Center. Defendant then gave his statement to police.

Barber maintains he held a reasonable belief that he was under arrest at the time he was transported to police headquarters for questioning. His argument certainly cannot be easily dismissed. Five police officers and numerous police vehicles were present when detective Biddle "requested" that Barber submit to questioning at the police station. Barber relies heavily upon *Dunaway v. New York, supra,* a case in which the Supreme Court held New York police violated the Fourth Amendment when, without probable cause, they took Dunaway into custody, transported him to a police station, and detained him there for interrogation. In footnote 6 Justice Brennan quoted from a tentative draft of the American Law Institute's Model Code of Pre-Arraignment Procedure § 2.01(3) and commentary, for the proposition that

> "[a] request to come to [a] police station 'may easily carry an implication of obligation, while the appearance itself, unless clearly stated to be voluntary, may be an awesome experience for the ordinary citizen.'"

442 U.S., at 207 n.6, 99 S.Ct. at 2253 n.6. It is clear, however, that the majority in *Dunaway* did not attempt to make an independent determination of whether a Fourth Amendment seizure had occurred, but relied for the most part on the state court's finding that Dunaway had been involuntarily detained. *Id.*

We do not believe *Dunaway* stands for the proposition that every time police transport an individual to a police station for questioning a Fourth Amendment seizure has occurred. This hard and fast rule would in some instances have absolutely no basis in fact after proper inquiry into the defendant's own perceptions during the in-

---

5. A search was conducted, but no stolen property was discovered.

cident. Instead, each case must be reviewed in an effort to determine whether, considering all the circumstances surrounding the encounter, the defendant entertained a reasonable belief that he was not free to leave.

In the present case defendant Barber had previously been arrested twice. He testified that each time he was arrested he was told he was under arrest, handcuffed, and physically placed in the rear seat of a police car. But when officer Sorrell drove Barber to the police station to talk to Captain Mowery, the defendant rode in the front seat of the squad car without handcuffs. Sorrell was the only officer in the automobile. The police never touched the defendant's person. Defendant Barber also knew officer Mowery and had provided him with information about a crime on a previous occasion.

■ Obviously, the better procedure would have been to inform defendant Barber that he was not under arrest and could not be compelled to answer questions at police headquarters. Indeed, the U.S. Supreme Court recognized the inherent coerciveness of station house questioning and the "badge of intimidation" such an atmosphere carries in *Miranda v. Arizona*, (1966) 384 U.S. 436, 457, 86 S.Ct. 1602, 1619, 16 L.Ed.2d 694. Were it not for defendant Barber's previous experience with law enforcement and his relationship with Captain Mowery, we would be drawn to an opposite result in this case. Police cannot expect to rely on the mere fact that the suspect is not actually told he is under arrest. We will not compromise the integrity of our court by allowing "law enforcement to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the 'procedural safeguards' of the Fifth." [6] However, we find sufficient evidence in the record to support the trial court's finding that the defendant did not believe he was under arrest or otherwise not free to terminate his encounter with the police in this case.

6. Comment, 25 *Emory L. J.* 227, 238 (1976).

## II. Admissibility of Transcript

Next defendant Barber argues the trial court erred when it allowed the prosecution to introduce a transcript of the defendant's confession into evidence. Specifically, Barber maintains the tape recording of his statement was the best evidence, citing *Duncanson v. State*, (1979) Ind.App., 391 N.E.2d 1157. Barber also alleges the transcript admitted at trial was an amended version of the transcript provided to defense counsel pursuant to an earlier discovery request.

■ We agree the tape recording of the defendant's confession was the best evidence of his statement, and that the transcript should have been used only to assist the members of the jury in their listening, if the court thought such a procedure necessary. *Duncanson v. State.* However, even if we assume the trial court erred by not requiring the best evidence in this case, we do not see how a reversal would be justified absent some indication or argument from the defendant that the tape recording did in fact differ from the transcript.

■ Barber also argues the transcript admitted into evidence differed from the transcript provided to defense counsel before trial. In his statement given to police, Barber recounted the conversation he had had with his accomplice, Lester Barber, on the day of the robbery. The first transcript read:

"He asked me to take him out to the by-pass there to do something with him. I said 'what was it?' He said, '*To get the Bargain Center.*' I said 'alright' so I went with him. So I just sat in the parking lot while he went down there and robbed the place. The only thing I did was drive away." (emphasis added)

The amended transcript admitted into evidence provided:

"He asked me to take him out to the by-pass there to do something with him. I said 'what was it?' He said, '*To go stick up the Bargain Center.*'" (emphasis added)

There can be no question that there was a material discrepancy between the two transcripts. Nor does the State question the prosecution's obligation to provide the defendant with an accurate transcript of his own statement. However, Barber does not argue the amended transcript differed from the actual tape recording of his confession, nor does he deny having stated, "To *go stick up* the Bargain Center." Instead, Barber alleges "this surprise prevented defense counsel from making adequate preparation in his defense strategies and did not allow additional discovery which the surprise dictated." What additional discovery and strategy the defendant believes would have benefited his case is not mentioned in his argument. We certainly will not order a reversal of his conviction absent some real showing that the trial court's error prejudiced the defendant. In short, we find any error in the admission of the amended transcript was harmless.

### III. Sufficiency of the Evidence

Finally, in two related arguments defendant Barber challenges the sufficiency of the evidence to support his conviction of robbery while armed with a deadly weapon. First, Barber argues there was no evidence to show the robbery involved the use of a deadly weapon. Barber also maintains no evidence was presented that he acted in unison with his cousin, Lester Barber, or that there was a prior common felonious design between the two men.

■ The evidence in this case shows that on September 6, 1979, defendant Phillip Barber drove his cousin, Lester Barber, to the Marion Bargain Center. Lester had asked Phillip to "do something with him, "to go stick up the Bargain Center." Upon Lester's request, defendant parked across the street instead of in the store's parking lot and waited for his cousin. The clerk of the Bargain Center was robbed by a man

wielding a short silver revolver. When Lester returned to the automobile, he got down on the floor of the car with money and a revolver in his hand. The men eventually returned to the defendant's home and split the money between them.

Ind.Code 35-41-1-2 defines "deadly weapon" as either:

"(1) A loaded or unloaded firearm; or

(2) A weapon, device, equipment, chemical substance, or other material that in the manner it was used, or could ordinarily be used, or is intended to be used, is readily capable of causing serious bodily injury." [7]

Defendant Barber relies on his own testimony to the effect that the revolver used in the robbery fired only blanks. Regardless of whether the jury chose to believe this testimony, even a blank revolver could be used as a bludgeoning instrument,[8] and could therefore be considered a "device . . . that in the manner it . . . could ordinarily be used . . . is readily capable of causing serious bodily injury."

■ As for the other elements of the crime, the trial court's Final Instruction Number 15 told the jury:

"Aiding, inducing or causing an offense is defined by statute as follows: a person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense . . . ."

There was evidence defendant Phillip Barber knew Lester Barber intended to "stick up" the Marion Bargain Center, that the defendant drove Lester to the scene of the crime, waited for him while he entered the store, and then provided Lester's means of escape. When confederates combine to commit an offense, each is responsible for the acts committed in furtherance of their common design. *Hogan v. State,* (1980) Ind., 409 N.E.2d 588; *Barnes v. State,* (1978) 269 Ind. 76, 378 N.E.2d 839. There

---

**7.** "Serious bodily injury" is defined in the same code section as:

"[I]njury that creates a substantial risk of death or that causes death, serious permanent disfigurement, unconsciousness, ex-

treme pain, or permanent or protracted loss or impairment of the function of a bodily member or organ."

**8.** See *McFarland v. State,* (1979) Ind.App., 384 N.E.2d 1104.

was sufficient evidence to prove the defendant aided Lester Barber in the commission of the crime charged.

The judgment of the trial court is affirmed.

YOUNG, P. J., concurs with opinion.

MILLER, J., concurs.

YOUNG, Presiding Judge, concurring.

I concur, not because, as the majority holds, no arrest or seizure of the defendant occurred, but because the error in the admission of the defendant's confession was waived by his failure to object to the introduction of the substance of that confession through the testimony on redirect examination of Officer Biddle. Were it not for this waiver, I would reverse the conviction because the defendant's confession is the fruit of his illegal arrest.

Contrary to the majority, I do not find sufficient evidence that the defendant voluntarily accompanied the police to the police station for questioning. Rather, an arrest or seizure of the defendant occurred when the defendant was approached by Officer Biddle and transported to the police station for questioning. Five police officers and five squad cars were present at the defendant's home prior to his being taken to the station. The defendant was watched continuously by police as he changed his clothes and used the bathroom before he was taken to the station. Most importantly, the defendant was never informed that he was "free to go"; he was transported in a squad car to the station and placed in an interrogation room. Three detectives were present when defendant, less than two hours later, gave his statement to police. It is quixotic, in light of these facts, to find that the defendant voluntarily accompanied the police to the station for custodial interrogation. Indeed, I would be hesitant to find a voluntary accompaniment by the defendant given the number of police officers present when the defendant was detained absent evidence that the defendant was informed by police that he was "free to go" at any time.

There was no probable cause for the arrest of the defendant. Rather, the detention and custodial investigation were used as an investigatory tool. There is, therefore, a quality of purposefulness in the police illegality that here occurred. *Morris v. State* (1980), Ind., 399 N.E.2d 740, 743. Finding an illegal arrest, the defendant's statements which are a product of that illegal invasion were inadmissible. However, as earlier stated, the error has been waived.