**Troy Daniel BUTLER, Appellant (Defendant Below),**

**v.**

**STATE of Indiana, Appellee (Plaintiff Below).**

**No. 3–884A227.**

Court of Appeals of Indiana, Third District.

May 23, 1985.

Rehearing Denied June 27, 1985.

William A. Padula, Hammond, for appellant.

Linley E. Pearson, Atty. Gen. of Ind., Michael Gene Worden, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee.

STATON, Presiding Judge.

A jury found Troy Daniel Butler guilty of burglary, a class B felony. Later, the trial court sentenced him to the Indiana Department of Correction for six years.

Three of the six years were suspended. In his appeal to this Court, Butler presents two issues for our review:[1]

I. Did the trial court err when it denied Butler's motion to suppress his written statement?

II. Whether the guilty verdict rendered by the jury is supported by sufficient evidence?

We affirm.

## I.

### Statement

The day after the burglary, February 2, 1983, Butler's uncle, Officer Anthony Sonaty of the Hammond Police Department, arrived at Butler's home. He was not in his uniform or driving a police car. He was in street clothes and driving his own personal automobile. Butler was told that he had been implicated in a neighborhood burglary and that it would be in his best interest to talk to the detectives about the burglary. While in his uncle's car on the way down to the Hammond Police Station, Butler admitted his involvement in the burglary. Later, when they arrived at the Hammond Police Station, Butler was taken to Sergeant Walter Murray who read to Butler his *Miranda* rights and had Butler sign a written waiver. Butler again related his involvement in the burglary. His statement was reduced to writing and read to him. He signed the statement in the presence of Detective Murray and his uncle.

Butler argues that his motion to suppress the written statement given to Sergeant Murray at the Hammond Police Station should have been granted, since it was unlawfully obtained. In support of his argument, he cites *Wong Sun v. United States* (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 and its progeny. He contends that his uncle's visit at his home was an "unlawful invasion" and that his written

statement was, under *Wong Sun*, the "fruit of the poisonous tree". In further support of his argument, he contends that the seven minute drive to the police station was not a sufficient lapse of time to negate the effect of his uncle's visit upon his will. *Morris v. State* (1980), 272 Ind. 467, 399 N.E.2d 740. Therefore, his written statement was not voluntarily given.

An identical argument was made in *Oregon v. Elstad* (1985), 470 U.S. ——, 105 S.Ct. 1285, 84 L.Ed.2d 222, upon an almost identical fact situation. The facts varied as to the person who came to the home. In *Oregon v. Elstad*, it was a uniformed policeman who came to the home instead of an uncle.

Justice O'Connor explained in *Oregon* how a procedural *Miranda* violation differs significantly from a constitutional violation of the Fourth Amendment which has traditionally mandated a broad application of the "fruits" doctrine.

"Respondent's contention that his confession was tainted by the earlier failure of the police to provide *Miranda* warnings and must be excluded as 'fruit of the poisonous tree' assumes the existence of a constitutional violation. This figure of speech is drawn from *Wong Sun v. United States,* 371 U.S. 471 [83 S.Ct. 407, 9 L.Ed.2d 441] (1963), in which the Court held that evidence and witnesses discovered as a result of a search in violation of the Fourth Amendment must be excluded from evidence. The *Wong Sun* doctrine applies as well when the fruit of the Fourth Amendment violation is a confession. It is settled law that 'a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is "sufficiently an act of free will to purge the primary taint." ' *Taylor v. Alabama,* 457 U.S. 687, 690

---

1. A third issue presented for our review was whether the trial court erred by overruling Butler's Motion for a Directed Verdict. This issue is waived, since Butler presented evidence in his own behalf. *Dack v. State* (1983), Ind.App., 457 N.E.2d 600; *Sanders v. State* (1981), Ind., 428 N.E.2d 23.

[102 S.Ct. 2664, 2667, 73 L.Ed.2d 314] (1982) (quoting *Brown v. Illinois,* 422 U.S. 590, 602 [95 S.Ct. 2254, 2261, 45 L.Ed.2d 416] (1975)).

But as we explained in *Quarles* and *Tucker,* a procedural *Miranda* violation differs in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the 'fruits' doctrine. The purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits. *Dunaway v. New York,* 442 U.S. 200, 216–217 [99 S.Ct. 2248, 2258–2259, 60 L.Ed.2d 824 (1979) ] (1979); *Brown v. Illinois,* 422 U.S. at 600–602 [95 S.Ct. at 2260–2261]. 'The exclusionary rule, ... when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth.' *Id.,* at 601 [95 S.Ct. at 2260]. Where a Fourth Amendment violation 'taints' the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the confession may be admitted in evidence. *Taylor v. Alabama, supra,* [457 U.S.] at 690 [102 S.Ct. at 2667]. Beyond this, the prosecution must show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation.

The *Miranda* exclusionary rule, however, serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony. Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda.* Thus, in the individual case, *Miranda's* preventive medicine provides a remedy even to the defendant who has suffered no identifiable

constitutional harm. See *New York v. Quarles,* 467 U.S. [——], at [——, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550 (1984) ]; *Michigan v. Tucker,* 417 U.S. 433, 444 [94 S.Ct. 2357, 2363, 41 L.Ed.2d 182] (1974).

But the *Miranda* presumption, though irrebutable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted."

105 S.Ct. at 1291–1292.

\*    \*    \*    \*    \*    \*

"Since there was no actual infringement of the suspect's constitutional rights, the case was not controlled by the doctrine expressed in *Wong Sun* that fruits of a constitutional violation must be suppressed...."

105 S.Ct. at 1293.

\*    \*    \*    \*    \*    \*

"It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."

105 S.Ct. at 1293–1294.

\*    \*    \*    \*    \*    \*

"The failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised. See *New York v. Quarles,* 467 U.S. at [——], and n. 5 [104 S.Ct. at 2631, and n. 5]; *Miranda v. Arizona,* 384 U.S. [436], at 457 [86 S.Ct.

1602, at 1618, 16 L.Ed.2d 694 (1966) ] . . . ."
105 S.Ct. at 1294.

\* \* \* \* \* \*

"We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights."
105 S.Ct. at 1296.

■ Butler further contends that he "... had completed only a ninth grade education, and surely could not be held to high standards in appreciating what was occurring. (TR.P. 69) Additionally, he had no significant history of familiarity with the criminal justice system, another factor often relied on to determine the voluntariness of a confession." (page 12–13 of Appellant's Brief) The *Oregon* Court disposes of this argument by simply stating: "This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness. See *California v. Beheler*, 463 U.S. [1121] at [1125], no. 3 [103 S.Ct. 3517, 3520, no. 3, 77 L.Ed.2d 1275 (1983) ]; *McMann v. Richardson*, 397 U.S. 759, 769 [90 S.Ct. 1441, 1448, 25 L.Ed.2d 763] (1970)." \* \* \* "Thus we have not held that the *sine qua non* for a knowing and voluntary waiver of the right to remain silent is a full and complete appreciation of all of the consequences flowing from the nature and the quality of the evidence in the case." 105 S.Ct. at 1297.

Our review of the evidence clearly indicates that Butler was not in the custody of his uncle on the way to the Hammond Police Station, and that Butler was not coerced in any way when he voluntarily indicated his involvement in the burglary to his uncle.[2] The statement given later to Sergeant Murray was voluntarily given. The trial court did not err in overruling Butler's Motion to Suppress.

## II.

### Sufficiency

Our standard of review is that if there is substantial evidence of probative value to support the verdict of the jury that Butler is guilty beyond a reasonable doubt, the verdict will not be set aside. *Jones v. State* (1983), Ind., 456 N.E.2d 1025; *Blackmon v. State* (1983), Ind., 455 N.E.2d 586.

■ The evidence most favorable to the verdict of the jury is as follows. Kenneth H. Young and his roommate, Paul Kaminski, had a disc-jockey business. When Kenneth Young returned to his home on February 1, 1983 at 1600 177th Street in Hammond, Indiana around three o'clock A.M., he found that the door which he had previously locked and secured was open about two inches. Further inspection revealed that the door was badly mangled and splintered. Once inside, he discovered some stereo equipment missing: two audio stereo speakers, a 400 watt amplifier, two Techniques turntables, a JVC portable stereo television, a pair of Bose 901 speakers, a Bose equalizer for the speakers, a music mixer, a TEAC cassette deck, and another power amplifier. Young further testified that most of the equipment belonged to his roommate Kaminski. When his roommate returned home, he and Kaminski with some of their friends searched the neighborhood. Two of the 901 Bose speakers were found in a neighbor's yard. Later, two large audio speakers and other

---

**2.** There is some conflict in the evidence regarding what Butler's uncle said to him about probation on their ride to the Hammond Police Station. However, Butler testified that Sergeant Murray did not refer to probation until after the statement had been given and Butler was ready to walk out the door. (T. 85).

stereo equipment were found in a blue van that Young had observed. These items were recovered with the aid of police.

David Wolf testified that he had known Butler for about ten years and Phillip Brogdan, Butler's accomplice, for about fifteen years. After he had left work at 1:30 A.M., he was driving his van down 177th Place in the fifteen hundred block when he was flagged down by Brogdan and Butler. He was asked if he wanted a stereo and he replied no. He was further asked if he wanted to make some money hauling stereo equipment, and he replied that he did not. During this conversation, Butler was standing about three or four feet behind Brogdan. Later Wolf had trouble with his van near the Woodmar Country Club. He was approached again by Butler and Brogdan. He learned from Brogdan that Young's house had been burglarized. After he fixed his van, he drove to the Fast Gas station and told Young what he had learned.

Phillip Brogdan, Butler's accomplice, testified that he met Butler and his girlfriend at the Fast Gas station on the night of the burglary. He owned Butler money and suggested that he knew where they could steal some stereo equipment. They left the Fast Gas station in Butler's cadillac for the 1600 block on 177th Street in Hammond. Butler stood about six feet behind Brogdan as a look out man while Brogdan used a prybar to open the backdoor of the house where Young and Kaminski resided. He and Butler carried the stereo equipment from the backdoor to a blue van nearby owned by Brogdan's "uncle", a Mr. Brewer. After loading the stereo equipment, they rode around in Butler's cadillac listening to Brogdan's police scanner. Later, they saw Wolf and tried to influence him to haul the stereo equipment away in his van, but he refused. The next day Brogdan observed the police towing his "uncle's" blue van away. He further testified that

he and Butler intended to split the money from the sale of the stereo equipment.[3]

Butler further contends that the State failed to show the ownership of the stereo equipment as alleged in the information. Kenneth Young testified that he and Kaminski were roommates and in possession of the premises at 1600 177th Street in Hammond, Indiana. He further testified that most of the stereo equipment taken by Butler and Brogdan was Kaminski's. After the burglary, Young identified some of the stolen stereo equipment found in a neighbor's backyard and in the blue van. Young's testimony clearly shows that Kaminski who was named in the information as the owner had possession of the premises and possession of the stereo equipment taken by Butler and Brogdan. We conclude that there is no fatal variance between the evidence and the information filed by the State; therefore, Butler's contention is without merit. It should be further noted that possession rather than ownership is the essential element in burglary. *Summers v. State* (1972), 153 Ind.App. 22, 285 N.E.2d 673; *Bradley v. State* (1964), 244 Ind. 630, 195 N.E.2d 347; 12 C.J.S. Burglary § 26, p. 685 (1938).

The judgment of the trial court is affirmed.

HOFFMAN and GARRARD, JJ., concur.

---

3. The State had agreed to drop the charges against Brogdan. He had committed this burglary while on parole from another burglary conviction. At the time of his testimony against Butler, he was doing six years for burglary.