Richard DILLON, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 282S67.

Supreme Court of Indiana.

Oct. 3, 1983.

Howard B. Lytton, Jr., Steven E. Ripstra, Lytton & Ripstra, Jasper, for appellant.

Linley E. Pearson, Atty. Gen. of Indiana, Palmer K. Ward, Deputy Atty. Gen., Indianapolis, for appellee.

HUNTER, Justice.

The defendant, Richard Dillon, was convicted by a jury of two counts of felony murder, Ind.Code § 35–42–1–1(2) (Burns 1979 Repl.), one count of burglary, a Class A felony, Ind.Code § 35–43–2–1 (Burns 1979 Repl.), and one count of conspiracy to commit burglary, a Class A felony, Ind. Code § 35–41–5–2 (Burns 1979 Repl.). The jury also recommended that a sentence of death be imposed upon defendant, Ind.Code § 35–50–2–9 (Burns 1979 Repl.), and defendant was thereafter sentenced to death by the trial court.

His direct appeal challenges the legality of the death sentence and presents the following issues for our review:

1. Whether the defendant was denied effective assistance of counsel at trial;

2. Whether the trial court erred in denying defendant's motion to suppress his inculpatory statement; and

3. Whether Indiana's death penalty statute is unconstitutional as violative of due process.

A brief summary of the facts from the record most favorable to the state shows that William and Mary Hilborn were found stabbed to death in their home in Petersburg, Indiana, on March 8, 1981. Defendant was observed walking in the vicinity of the Hilborns' property around the time of the murders by a deputy sheriff. He was questioned by the police at work on March 10, 1981, and at his home on March 11, 1981. He denied being in Petersburg at the time of the murders and said he had been in Princeton, Indiana, with a friend, J.R. Thompson. A knife which was identified as the murder weapon was found in Thompson's car. On March 12, 1981, the police asked defendant if he would go with them to the sheriff's office to clear up some discrepancies concerning his actions on March 8. Defendant voluntarily accompanied the officers to the sheriff's office. He signed two waiver of rights forms and gave two statements, the second of which was a confession.

I.

Defendant first alleges that he was denied the effective assistance of counsel at his trial. On July 7, 1981, approximately two weeks prior to the trial, the court held a hearing on defendant's motion to suppress. At this time his retained counsel filed a motion for postponement and continuance which reads in pertinent part:

"1. That counsel for the defendant may have not had the presence of mind to effectively represent the defendant during the course of the pre-trial proceedings, due to personal problems, to-wit:

"a. On April 15, 1981, during the course of pre-trial proceedings, counsel for the defense was divorced from his wife of eleven (11) years, which divorce was the desire of counsel's wife, and against said counsel's wishes.

"b. On April 18, 1981, counsel's brother, Ronald D. Fulcher, was seriously injured in a motorcycle accident, in Knox County, and remains paralyzed in the Veterans Hospital in Hines, Illinois at this date.

"c. That on Sunday, July 5, 1981, counsel's Father, Randall R. Fulcher, was rushed to the Veterans Hospital in Indianapolis, Indiana and on Monday July 6, 1981 underwent eleven hours of emergency heart surgery and at this date remains in an unconcious [sic] state, in serious condition.

"2. That the State continues daily to provide the defendant with new items of discovery, despite statements prior thereto that discovery is; complete, and such new discovery has led the defendant to new avenues of defense which defendant should pursue, to provide an adequate defense.

"3. That the course of the investigation by defense has turned up possible new evidence, which could not have been discovered in the short period of time allowed for pre-trial proceedings.

"WHEREFORE, defendant respectfully submits to this Court that to proceed with the trial as scheduled, after such a short period of time for preparation of its defense would effectively deprive defendant of its right to a fair trial, and that to proceed with hearings and trial as scheduled while defendant's counsel is having personal problems, and immediately after defense counsel's other personal problems would effectively deny the defendant of the right to competent counsel."

The hearing was continued on July 8, 1981, and the trial court specifically asked defendant if he was aware of his attorney's personal problems and if he wanted his attorney to withdraw. Defendant answered that he was aware of the circumstances

but that he did not wish the attorney to withdraw. The court reminded the attorney that it was the court's duty to determine whether or not an attorney was competent to represent a defendant. Here the attorney had been hired four months prior to the trial. The court also said he had considered all the hours of preparation which had already been spent by both parties on this case, the fact that witnesses had been subpoenaed, jury panel members had been notified, and the court's calendar for the next six months was extremely congested so any delay at that time would mean a long postponement for the trial. After hearing further arguments by both sides, the court denied both the motion to suppress and the motion for a continuance. However, the record shows that after the jury had been selected the court did grant a continuance so that counsel would have an extra weekend to prepare for the trial. The trial proceeded on Monday, July 20, 1981, without further objection by defendant or his counsel.

At the hearing on the motion to correct errors the trial counsel filed an affidavit stating that due to his personal problems he had not had time to adequately prepare for defendant's trial, that he felt he had not been competent to represent the defendant properly, and that he felt a new trial should be granted. The state filed counter affidavits which summarized many of the actions the attorney had taken in preparing for this trial, his conduct during the trial itself, and the times when the various personal problems arose in relation to the time of the trial. The court denied the motion to correct errors with the following findings:

"The court finds that:

"1. There was sufficient evidence before the jury from which they could find the defendant guilty beyond a reasonable doubt."

"2. At the pre-trial hearing on defendant's motion to suppress, the court found that the statements of the defendant were admissible at trial. No new evidence was presented at trial which would have required a reversal of that ruling.

"3. The Indiana Supreme Court has upheld the constitutionality of the death penalty statute.

"4. On the first day of trial, prior to voir dire of the jury, defendant's attorney requested a continuance which was denied. He then offered to withdraw as counsel for defendant and defendant was given the opportunity to accept the withdrawal and have other counsel appointed. The defendant elected to continue with his hired counsel. Thereafter, defendant's attorney performed adequately during trial.

"5. After the evidentiary part of the trial had begun, the defendant, outside the presence of the jury, attempted to enter a plea of guilty which was rejected because the court, based upon defendant's rendition of the facts, could not find a factual basis for the plea. The court immediately thereafter sequestered the jury.

"Upon these findings the court denies defendant's motion to correct errors."

Defendant's argument of incompetency of counsel is based primarily upon the allegedly inadequate time his counsel had for preparation and the fact that counsel failed to tender any final instructions. Our law regarding the issue of competency of counsel is well settled. Counsel is presumed to have prepared and executed his client's defense effectively, and strong and convincing evidence is required to rebut the presumption. *Lindley v. State,* (1981) Ind., 426 N.E.2d 398; *Rinard v. State,* (1979) 271 Ind. 588, 394 N.E.2d 160. Incompetency of counsel revolves around the particular facts of each case and the reviewing court will consider the totality of the circumstances surrounding counsel's pretrial preparation and the actual conduct of the trial. The standard of review is the mockery of justice test as modified by the adequate legal representation standard. *Hollon v. State,* (1980) Ind., 398 N.E.2d 1273; *Crisp v. State,* (1979) 271 Ind. 534, 394 N.E.2d 115; *Cottingham v. State,* (1978) 269 Ind. 261, 379 N.E.2d 984.

■ A careful examination of the record in this case reveals the following facts: counsel entered his appearance for defendant approximately four months before the trial; his wife had filed for divorce one month prior to his entering his appearance in this cause; his divorce was final eighty-nine days before the trial; his brother's accident occurred eighty-five days before trial; and his father had been ill for some time prior to trial but did not die until forty-seven days after the trial began. Thus, while we appreciate the fact that counsel was experiencing unusual pressure during that pretrial period, his personal problems and trial preparation time were spread out over a period of months, and he had a reasonable amount of time to prepare for this trial.

■ Defendant also argues that his counsel's failure to tender any final instructions was an indication of his incompetence. We disagree. The record shows that defendant's trial counsel prepared and tendered to the court eleven proposed preliminary instructions, but these were either withdrawn or refused as covered by the court's own instructions. The trial court gave many of its own instructions, both preliminary and final, which were sufficient to cover the necessary points of law. Defendant does not point out now any way in which the trial court's instructions were improper or inadequate. Trial counsel's failure to tender instructions on issues which are adequately covered by the court's own instructions does not show incompetence. *Leaver v. State,* (1981) Ind., 414 N.E.2d 959.

■ The record further shows many specific actions the attorney took on defendant's behalf both prior to and during the trial. Prior to trial, the attorney sought and was granted a change of venue from Pike County. He interviewed witnesses prior to trial, requested and was granted full discovery, viewed all of the state's physical evidence, read and copied the grand jury testimony, filed several pretrial motions, attended and offered evidence at pretrial hearings, attended omnibus hearings, subpoenaed and presented witnesses on defendant's behalf, consulted with the state's attorney several times prior to trial, viewed the list of prospective jurors, and consulted with the attorney representing defendant's accomplice. He visited defendant at least ten to fifteen times while he was in the Pike County jail and on four or five occasions in the jury room of the Pike Circuit Court, averaging forty to sixty minutes on each occasion. During the trial, counsel extensively cross-examined the state's witnesses, called witnesses on behalf of defendant, called defendant as a witness in his own behalf, and made timely objections and a lengthy closing argument to the jury.

In this case, there was evidence to show that defendant's trial counsel had rendered adequate assistance in both the pretrial phase and the trial itself and that he had presented a partial alibi defense for defendant in the face of substantial evidence to the contrary. He was well prepared for the trial and had an informed basis for making his trial strategy decisions. Furthermore, defendant has not presented any specific facts which demonstrate ineffective representation. The trial as a whole was not a mockery of justice. In fact, the record shows that defendant had vigorous representation in the face of overwhelming evidence, including his own confession, against him. The record does not show that defendant was denied effective assistance of counsel.

### II.

Defendant next alleges that the trial court erred in admitting into evidence his inculpatory statements because they were the product of an unlawful detention. The facts surrounding the giving of these statements were brought out at the hearing on defendant's motion to suppress. During the investigation of the instant crime, defendant had been questioned briefly two different times by police officers, once at his home and once at work. The police thought he might be a witness to the crime as he had been seen near the scene of the crime. The police questioned defendant's friend,

J.R. Thompson, and found evidence in Thompson's car that indicated defendant might have been lying to them when he originally answered their questions.

At this point, on March 12, 1981, four days after the murders, two police officers went to defendant's home and saw his brother out in the yard. The brother called for defendant to come over to the car and the officers identified themselves and said they would like to talk to him. They asked defendant if he would come to the police station in order to talk about some of the things he had previously told them concerning events on the day of the murders. Defendant said, "Sure." Then defendant and one of the officers went into the house and told defendant's mother where they were going. Defendant got a jacket from his room. He rode to the station in the back seat of the police car. He was not handcuffed and was not under arrest or treated as a suspect. Both officers rode in the front of the car. The officers specifically testified that they told defendant he didn't have to come with them if he didn't want to, but he voluntarily agreed to go with them.

At the police station, defendant was taken to the sheriff's office which was furnished with a wooden desk, comfortable chairs, a bookcase and carpeting. He was given a waiver of rights form which he read and signed. He then gave a taped statement about his activities on March 8 in which he indicated that he had been with J.R. Thompson but had not been in the vicinity of the crimes. The two police officers left the room and discussed what defendant had told them. They concluded that his statements were not truthful, in light of other information they had which showed that he had been seen by a deputy sheriff in the vicinity of the victims' home near the time the murders occurred. The officers returned to the room and told defendant they felt his statements were not truthful. Defendant was advised that they were discussing the crime of murder and the possible penalties, but that the final decision on the charges to be filed was up to the prosecutor. Defendant never asked to have an attorney present but he wanted the prosecutor to be contacted so he would know what charges he would be facing. One of the officers left the room to call the prosecutor, who agreed to come to the sheriff's office. Then, defendant looked at the officer who was in the room with him and said, "Well, we did it," and started crying. The other officer returned to the room and defendant was again advised of his rights and signed a second waiver of rights form. He gave a second statement admitting his part in the murders.

After the second statement was given, the prosecutor and his deputy arrived and advised defendant of the possible criminal charges he faced. The entire period of questioning took approximately two and one-half hours. Defendant was free to leave at any time during this period and the doors to the office were not locked. He did not ask for any food and was given a soft drink. He was never threatened or physically abused and no promises of leniency were made. Defendant was not arrested until after he gave his taped confession and the following day he appeared before a magistrate all as provided by statute.

Defendant contends that he could not have voluntarily waived his rights as he had been smoking marijuana and took two Quaaludes on the day he was questioned. Defendant's mother testified that she and her husband went to the police station and asked to see defendant, but the officers wouldn't let them see him and just said they would tell them what happened. In rebuttal, Officer Nelson testified that in his opinion defendant was not under the influence of drugs at the time the statements were given. Officer Sibbitt testified that he did not recall defendant's parents asking to see their son but only that they inquired where he was and what was going on and then left the sheriff's office.

■ As a court of review, we review the question of the admissibility of a confession as we do other sufficiency matters. We do not weigh the evidence, but rather determine whether there was substantial evi-

dence of probative value to support the trial court's finding. This is true even though conflicting evidence is presented on the issue of voluntariness. *Long v. State,* (1981) Ind., 422 N.E.2d 284; *Battle v. State,* (1981) Ind., 415 N.E.2d 39; *Arch v. State,* (1978) 269 Ind. 450, 381 N.E.2d 465.

■ It is clear that if a confession is the product of an unlawful detention or an illegal arrest it is inadmissible. *Dunaway v. New York,* (1979) 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824; *Brown v. Illinois,* (1975) 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416. *Triplett v. State,* (1982) Ind., 437 N.E.2d 468; *Morris v. State,* (1980) Ind., 399 N.E.2d 740. However, it is also clear that not every police-citizen encounter amounts to a "seizure" of the person so that an arrest or unlawful detention has occurred. The test for determining whether a person has been "seized" for Fourth Amendment purposes is whether, considering all the circumstances surrounding the police-citizen encounter, the defendant entertained a reasonable belief that he was not free to leave. *Dunaway v. State,* (1982) Ind., 440 N.E.2d 682; *United States v. Mendenhall,* (1980) 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (plurality opinion); *Barber v. State,* (1981) Ind.App., 418 N.E.2d 563.

■ In this case, the facts are sufficient to show that defendant voluntarily accompanied the officers to the police station and gave two voluntary statements. The officers specifically told defendant he did not have to come with them if he didn't want to. He was not handcuffed or otherwise treated as a suspect or an arrestee and rode by himself in the back seat of the police car to the police station. He talked to the officers in the sheriff's private office with both doors unlocked and was not physically restrained, abused, or threatened. He was not unreasonably interrogated or deprived of food, water, or rest. Defendant admitted that he had not been threatened or coerced by the police and that he had signed the waiver of rights forms and given the statements. There was no promise of leniency. This was sufficient evidence to support the trial court's finding that de-

fendant's confession was not the product of an illegal detention and was voluntarily given.

### III.

■ Defendant finally argues that Indiana's death penalty statute violates due process and is unconstitutional in several respects. He first argues that our statute vests the trial judge with unlimited discretion in imposing the death penalty after a jury trial as the judge is not bound by the jury's recommendation or any other objective standards. There is no merit to this contention since the statute specifically states: "The court shall make the final determination of the sentence, after considering the jury's recommendation, *and the sentence shall be based on the same standards that the jury was required to consider."* Ind.Code § 35–50–2–9(e)(2) (emphasis added). He also argues that due process is violated because the trial judge can consider all evidence introduced during the trial at the sentencing hearing. He alleges that this allows the judge to consider inadmissible evidence presented to the court for rulings during the course of the trial as part of the basis for imposing the death penalty. Contrary to defendant's allegations, the statute does limit the type of evidence which may be considered during the sentencing hearing in the following manner: "The jury, or the court, may consider *all the evidence introduced at the trial stage* of the proceedings, together with new evidence presented at the sentencing hearing." Ind.Code § 35–50–2–9(d) (emphasis added). Evidence which is introduced at trial is not inadmissible evidence. Furthermore, the court's reasons for imposing the death penalty must be stated in writing and are reviewed by this court to safeguard against the influence of improper or prejudicial factors at the trial level and to determine that there were no elements of arbitrariness or capriciousness in the sentencing decision.

■ Defendant further argues that his right against self-incrimination is violated since any testimony he gives during the

trial on the underlying felony is also considered during the sentencing hearing. However, our statute clearly does not prevent an accused from exercising his right not to testify during the trial on the underlying felony. When testimony which defendant gave at trial is used again at the sentencing hearing, there is no violation of any constitutional right since the issue of guilt or innocence has already been determined. Furthermore, the state bears the burden of proving the existence of at least one of the aggravating circumstances beyond a reasonable doubt before the death penalty can be imposed. Ind.Code § 35-50-2-9(e).

Defendant also contends that the death penalty constitutes vindictive justice and therefore violates Article 1, Section 18 of the Constitution of the State of Indiana. He further contends that the provision for the same trier of fact to determine both the merits of the underlying felony and the applicability of the death penalty violates his right to due process. We have dealt with both these arguments in previous cases. We have consistently held that the death penalty does not offend Article 1, Section 18 of our state constitution and that our death penalty statute is not unconstitutional *per se,* as being in derogation of the Eighth Amendment to the United States Constitution. We have found that Article 1, Section 18 of the Indiana Constitution is an admonition to the legislative branch of the state government and is addressed to the public policy which the legislature must follow in formulating the penal code. It applies to the penal laws as a system to insure that these laws are framed upon the theory of reformation as well as the protection of society. *Schiro v. State,* (1983) Ind., 451 N.E.2d 1047; *Williams v. State,* (1982) Ind., 430 N.E.2d 759, *appeal dismissed,* (1982) —— U.S. ——, 103 S.Ct. 33, 74 L.Ed.2d 47; *Brewer v. State,* (1981) Ind., 417 N.E.2d 889, *cert. denied,* (1982) 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384; *Judy v. State,* (1981) Ind., 416 N.E.2d 95; *French v. State,* (1977) 266 Ind. 276, 362 N.E.2d 834.

The procedural scheme set out in our statute limits the imposition of death sentences so as to insure that they will not be inflicted arbitrarily or capriciously in accord with the decisions and opinions of the United States Supreme Court. *Gregg v. Georgia,* (1976) 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Proffitt v. Florida,* (1976) 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; *Jurek v. Texas,* (1976) 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929. Although our statute provides that the same jury that made the guilt determination hears the sentencing portion of the trial, the adherence to the standard of proof beyond a reasonable doubt and the customary evidentiary rules insure that fundamental fairness and due process are protected during the proceedings. Furthermore, the sentencing proceeding is not a separate guilt determination. Our statute provides that the death penalty may be imposed if the circumstances of the offense and the character of the offender both warrant; our death sentencing procedures are consistent with and in full compliance with the requirements set forth by the Supreme Court in *Proffitt v. Florida, supra,* and *Gregg v. Georgia, supra.*

We now turn to a review of the imposition of the death penalty in the instant case. A careful review of the record reveals that all of the statutory procedures were followed in the trial of this defendant. During the guilt determination phase of the proceedings, the jury found beyond a reasonable doubt that defendant conspired with another individual to commit burglary in the home of William and Mary Hilborn because they heard the Hilborns kept a large amount of money in their home. They carried out this plan by breaking and entering the residence with the intent to commit theft and were inside the house when the victims returned home. The testimony showed that defendant had an opportunity to leave the house before committing the murders, but decided it would be necessary to kill both the Hilborns so there wouldn't be any witnesses. Defendant was the person who actually stabbed the victims. The victims were an elderly couple

and both were stabbed numerous times. Mrs. Hilborn was also slashed in several places on her neck and hand apparently in an effort to get her to tell where the money was hidden. She had a severe stab wound in her stomach and a fatal stab wound in her back which according to the doctor's testimony was received after she had already fallen to the floor. There was evidence that Mr. Hilborn had struggled with his assailant and tried to defend himself with a billy club. He also had a severe stab wound to the stomach and apparently received a fatal wound to his heart when he attempted to go to the aid of his wife. No money was found in the house even though the victims had cashed their monthly retirement check a few days earlier. The evidence clearly sustains the jury's finding that defendant intentionally killed both victims while committing the burglary.

■ A separate sentencing hearing was held following the guilt determination at which time defendant presented evidence in his own behalf. Proper and complete instructions were given at both phases of the trial. By a written, unanimous verdict, the jury returned a recommendation that defendant be sentenced to death. The trial judge then considered all the evidence in the case, the jury's recommendation, and the aggravating and mitigating circumstances before imposing the death penalty. He entered his written statement of findings and reasons for the imposition of the death penalty in accordance with the requirements of Ind.Code § 35–50–2–9. This written statement shows that the judge considered the specific facts of the instant crimes and the character of defendant. After a brief summary of the evidence in his written findings the judge stated:

> "Accordingly, the jury was justified in finding beyond a reasonable doubt the existence of the aggravating circumstances of an intentional killing of the victims while committing a burglary and that the defendant committed another murder.

"In reviewing the seven possible mitigating circumstances considered by the jury, the court finds:

"1. The defendant had no significant history of prior criminal conduct. This is a mitigating circumstance which must be weighed against the aggravating circumstances.

"2. There was no evidence that the defendant was under extreme mental or emotional disturbance when he committed the murders. The defendant's confession revealed that he was somewhat fearful of being apprehended for the burglary, however, that same confession also revealed that the defendant and his accomplice had nearly left the residence by way of the kitchen and then returned to the living room and bedroom where the killings took place.

"3. The evidence shows that the victims were completely unaware that the defendant and his accomplice were inside the residence when they arrived at their home. Thus, the victims were not participants in nor did they consent to the defendant's conduct.

"4. Juvenile proceedings have been instituted against the defendant's accomplice for his participation in these crimes. In his confession the defendant stated that he, the defendant, stabbed both of the victims. Thus, the defendant's participation in the murders was not minor.

"5. There was no evidence that the defendant was under substantial domination of another person.

"6. The defendant did not file a plea of insanity nor did he file a plea alleging lack of comprehension. In his confession the defendant stated that he had consumed a small quantity of controlled substances on the day of the murders and that he was high. The testimony of witnesses detailing the defendant's actions shortly after the killings show that his thinking was clear and was well aware of what had occurred. The evidence fails to substantiate that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirement of the law was substantially

impaired as a result of mental disease or defect or of intoxication.

"7. As to any other circumstances appropriate for consideration, the only other circumstance which might be considered is the defendant's age of 18 years. This is not necessarily to be considered as a mitigating circumstance, particularly in view of the obvious torture inflicted upon at least one of the victims prior to the final fatal blow. The capability of such cruelty in the mind of one that age cannot be considered a mitigating circumstance.

"In conclusion the court finds beyond a reasonable doubt that the aggravating circumstances of the intentional killing of the victims while committing a burglary and the defendant having committed two murders outweigh the mitigating circumstance of no significant history of prior criminal conduct. Accordingly, the court finds the jury recommendation to be proper and lawful and that the court has a duty to follow such recommendation."

We have reviewed the written findings and reasons along with the evidence in the case and find that the record clearly supports the conclusion that the imposition of the death sentence was determined by the nature of the offense and the character of the offender. Two of the statutory aggravating circumstances were proved beyond a reasonable doubt and both the jury and the judge found that these aggravating circumstances outweighed the mitigating circumstance of no prior criminal history. We find that the trial court in all respects properly followed the required procedures in imposing the sentence of death. The evidence in the record supports our conclusion that the sentence of death was not arbitrarily or capriciously arrived at and is not manifestly unreasonable.

The judgment of the trial court is affirmed in all things; the cause is remanded to the trial court for the purpose of fixing a date for the death sentence to be carried out.

GIVAN, C.J., and PIVARNIK, J., concur.

DeBRULER, J., concurs and dissents with opinion in which PRENTICE, J., concurs.

DeBRULER, Justice, concurring and dissenting.

Operations required to be performed by the jury and judge after the conclusion of a death sentencing hearing are set forth in Ind.Code § 35–50–2–9(e) which provides:

"(e) If the hearing is by jury, the jury shall recommend to the court whether the death penalty should be imposed. The jury may recommend the death penalty only if it finds:

(1) That the state has proved beyond a reasonable doubt that at least one of the aggravating circumstances exists; and

(2) That any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances. The court shall make the final determination of the sentence, after considering the jury's recommendation, and the sentence shall be based on the same standards that the jury was required to consider. The court is not bound by the jury's recommendation."

According to this statute the "final determination of the sentence" is to be made by the judge by applying the same standards used by the jury in reaching its recommendation. The first standard to be applied by the judge is the trier-of-fact standard of proof beyond a reasonable doubt. One of the major goals of this sentencing process is to prevent the discriminatory and arbitrary imposition of the death penalty. *Brewer v. State,* (1982) Ind., 417 N.E.2d 889. This goal, under this statute, is in major part to be assured through the requirement that the judge, as trier of fact, be persuaded to a moral certainty beyond a reasonable doubt that an aggravating circumstance has been proven. In order to accomplish this essential operation, the judge must be in a trier-of-fact mindset and not a review or appellate mindset. *Schiro v. State,* (1983) Ind., 451 N.E.2d 1047, separate concurring and dissenting opinions of DeBruler, J., and Prentice, J. Without appellate enforce-

ment of this requirement, the death judgment will be based upon an advisory jury verdict which is reviewed for sufficiency of the evidence by the sentencing judge. That is no judgment at all. That would be totally at odds with the purpose of the layered statutory scheme to prevent the arbitrary and discriminatory imposition of the death penalty.

The finding and judgment of the sentencing court below is as follows:

"The Court now enters finding and reasons for the imposition of the death penalty as recommended by the jury in this case as follows:

The defendant, Richard Dillon, was found guilty of the killings of William Hilborn and Mary Hilborn during the commission of a burglary in the guilt determination stage of the trial.

At the sentencing hearing, the burden was upon the State of Indiana to prove beyond a reasonable doubt that the murders were intentional and committed during the perpetration of a burglary as set forth in Counts VII and VIII of the charging information. The State moved to incorporate by reference the testimony presented in the first stage of the trial, which motion was granted. The testimony showed that the defendant and another broke and entered the Hilborn residence with the intent to commit the felony of theft. While the defendant and his cohort were inside the residence in the process of committing the burglary, William and Mary Hilborn returned to their home. The defendant and his accomplice, while in hiding inside the house, determined that it would be necessary to kill both William and Mary Hilborn in order to escape criminal prosecution and then carried out that plan. Accordingly, the jury was justified in finding beyond a reasonable doubt the existence of the aggravating circumstances of an intentional killing of the victims while committing a burglary and that the defendant committed another murder.

In reviewing the seven possible mitigating circumstances considered by the jury, the Court finds:

1. The defendant had no significant history of prior criminal conduct. This is a mitigating circumstance which must be weighed against the aggravating circumstances.

2. There was no evidence that the defendant was under extreme mental or emotional disturbance when he committed the murders. The defendant's confession revealed that he was somewhat fearful of being apprehended for the burglary, however, that same confession also revealed that the defendant and his accomplice had nearly left the residence by way of the kitchen and then returned to the living room and bedroom where the killings took place.

3. The evidence shows that the victims were completely unaware that the defendant and his accomplice were inside the residence when they arrived at their home. Thus, the victims were not participants in nor did they consent to the defendant's conduct.

4. Juvenile proceedings have been instituted against the defendant's accomplice for his participation in these crimes. In his confession the defendant stated that he, the defendant, stabbed both of the victims. Thus, the defendant's participation in the murders was not minor.

5. There was no evidence that the defendant was under substantial domination of another person.

6. The defendant did not file a plea of insanity nor did he file a plea alleging lack of comprehension. In his confession the defendant stated that he had consumed a small quantity of controlled substances on the day of the murders and that he was high. The testimony of witnesses detailing the defendant's actions shortly after the killings show that his thinking was clear and was well aware of what had occurred. The evidence fails to substantiate that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirement of the law was substantially impaired as a result of mental disease or defect or of intoxication.

7. As to any other circumstances appropriate for consideration the only other circumstance which might be considered is the defendant's age of 18 years. This is not necessarily to be considered as a mitigating circumstance, particularly in view of the obvious torture inflicted upon at least one of the victims prior to the final fatal blow. The capability of such cruelty in the mind of one that age cannot be considered a mitigating circumstance.

In conclusion the court finds beyond a reasonable doubt that the aggravating circumstances of the intentional killing of the victims while committing a burglary and the defendant having committed two murders outweigh the mitigating circumstances of no significant history of prior criminal conduct. Accordingly, the court finds the jury recommendation to be proper and lawful and that the Court has a duty to follow such recommendation.

DATED: August 21, 1981.

Edward C. Theobald, Judge

Superior Court of Knox County"

There is no direct statement here that the sentencing judge was persuaded beyond a reasonable doubt that the defendant is guilty of felony murder and at the time of such offense intentionally killed one of the victims, the elements of the aggravating circumstance relied upon by the State. Ind. Code § 35–50–2–9(b)(1). Instead, this record shows a review of the evidence supporting the existence of the aggravating circumstance. There is no dealing with that evidence as a trier of fact. It may be that this has occurred again because of the lack of precision in the language of the statute. *Cf. Schiro v. State, supra.* It may be because the trial and sentencing process in a capital case has become too complicated and demanding. Whatever the difficulty, this Court should stand firm and require a clear demonstration that the essential operations of the death sentencing process have taken place. I find no such demonstration here, and therefore must vote to set aside the penalty of death. I do not, however, find legal or constitutional grounds for reversal and therefore vote to affirm the conviction.

PRENTICE, J., concurs.