Richard DILLON, Petitioner-Appellant,

v.

Jack DUCKWORTH, Warden, Indiana State Prison, Respondent-Appellee.

No. 84–2208.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 31, 1984.

Decided Dec. 28, 1984.

As Corrected Jan. 4, 1985.

---

**9.** This course was also taken by the government, though after some prodding by Judge Keeton, in *In re Application, supra.*

**10.** *See* n. 3 *supra.*

Steven E. Ripstra, Lytton & Ripstra, Jasper, Ind., for petitioner-appellant.

David A. Arthur, Deputy Atty. Gen., Indianapolis, Ind., for respondent-appellee.

Before CUMMINGS, Chief Judge, COFFEY, Circuit Judge, and HAYNSWORTH, Senior Circuit Judge.*

---

* The Honorable Clement F. Haynsworth, Jr., Senior Circuit Judge of the United States Court of Appeals for the Fourth Circuit, sitting by designation.

CUMMINGS, Chief Judge.

Defendant Richard Dillon appeals from the district court's denial of his petition for writ of habeas corpus. While we affirm that court's refusal to hold an evidentiary hearing and its finding that the state trial judge's imposition of the death sentence complied with Indiana law, we disagree with the court's conclusion that Dillon received effective assistance of counsel under the Sixth Amendment.[1] Accordingly the writ of habeas corpus must issue if there is no retrial.

## I

Dillon was convicted on July 28, 1981, by the Knox County, Indiana, Superior Court of two counts of felony murder and one count each of burglary and conspiracy. These charges stemmed from the March 8, 1981, stabbing murder of William and Mary Hilborn during a burglary. The eighteen-year-old defendant was arrested four days later after making a lengthy written confession to Indiana state police officers, a confession that was admitted into evidence at his trial. He had no prior criminal record.

Lawyer Jimmy Fulcher represented Dillon at trial. Although Fulcher had some civil and criminal experience, that experience was limited. He had been admitted to the bar for only two and one-half years, and his only significant courtroom experience was a "major felony trial" (Tr. Vol. I at 13) that he had just completed. Fulcher's representation of Dillon occurred during a time of personal crisis for him. In February 1981 his wife of eleven years filed for divorce, a divorce that became final against his wishes on April 15, 1981 (Tr. Vol. I at 12). On April 18, 1981, his brother had a motorcycle accident that left him paralyzed (*id.* at 6; Tr. Vol. III at 633). Trial was scheduled to begin on July 13, 1981. On July 5, Fulcher's father, who had been quite ill for some time, underwent emergency heart surgery and was in the hospital in very serious condition (Tr. Vol. I at 6). This final event prompted Fulcher to file an affidavit on July 7, attesting to his own incompetence and requesting a continuance from the July 13 trial date so that he could prepare adequately. The trial judge denied his request, although after the jury was selected he did delay trial until July 20 to afford Fulcher an extra weekend in which to prepare.

Dillon's trial concluded at the end of July. The trial judge, following the recommendation of the jury, sentenced Dillon to death on August 21, 1981. After exhausting all state remedies, Dillon filed a petition for writ of habeas corpus in federal district court. He requested the court to hold an evidentiary hearing on allegedly new evidence relating to his claim of ineffective assistance of counsel, a request that the district court denied. Petitioner argued (1) that he had been deprived of assistance of counsel in violation of the Sixth Amendment, (2) that he was convicted in part on evidence obtained during an illegal detention in violation of his Fourth Amendment rights, (3) that the Indiana death penalty statute was unconstitutional, and (4) that the trial court did not find beyond a reasonable doubt that elements to support the imposition of the death sentence were present. The district court denied each of these contentions. Dillon appeals the denial of the evidentiary hearing and his claims relating to assistance of counsel and the trial court's imposition of the death penalty.

## II

The Sixth Amendment guarantees criminal defendants the "Assistance of Counsel," which numerous Supreme Court cases have defined as the effective assistance of counsel. See, *e.g., United States v. Cronic,* —— U.S. ——, 104 S.Ct. 2039, 2044, 80 L.Ed.2d 657 (1984). Last Term, two Supreme Court cases, *Cronic* and *Strickland v. Washington,* —— U.S. ——, 104

---

1. The Sixth Amendment provides in pertinent part:

In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defense.

S.Ct. 2052, 80 L.Ed.2d 674 (1984), clarified the relevant standards in evaluating allegations of ineffective assistance of counsel.[2] *Strickland* governs the instant situation. In order to prevail under *Strickland,* a defendant must prove both that counsel's performance was so deficient that it fell below standards of reasonable professional performance and that this deficient performance prejudiced the defense sufficiently to deprive the defendant of a fair trial. A court's scrutiny of counsel's performance is highly deferential. *Strickland,* —— U.S. at ——, 104 S.Ct. at 2064–2065. In analyzing the counsel provided by Jimmy Fulcher, "the question is whether there is a reasonable probability that, absent the errors, the sentencer * * * would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.,* 104 S.Ct. at 2069. Nevertheless, the principles stated in *Strickland.*

> do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

*Id.*

■■■ The affidavit Fulcher filed alleging his own incompetence, a claim he reaffirmed in a second affidavit filed after the trial (Tr. Vol. I at 6–7), renders Dillon's allegation of ineffective assistance highly unusual. That an inexperienced attorney was defending Dillon, a young defendant with no prior criminal record, on very serious charges augments the significance of this affidavit. These circumstances cause us to examine Dillon's petition with care. Although Dillon was only eighteen years old and was facing trial on charges for which the State of Indiana had recommended the death penalty, the trial judge seemed more concerned with the disruption in his schedule caused by the defense's successful change of venue motion and the inconvenience a continuance would cause than in seriously evaluating the allegations of trial incompetence placed before him (Tr. Vol. III 640–641). We recognize the trial court's frustration with Fulcher's request. We also recognize that the scheduling problems trial courts face mandate that they be granted "broad discretion * * * on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Morris v. Slappy,* 461 U.S. 1, 12–13, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983) (quoting *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964)). *Morris,* however, was a completely different case. In that case the defendant insisted that his attorney was unprepared despite counsel's affirmative statements that he was prepared, that he had familiarized himself with the evidence and record to date, and that he had met with the defendant several times. In the case before us, the attorney himself believed that he was incompetent to try the case on grounds that amply justified his request for delay. Nonetheless, the trial judge arbitrarily denied Fulcher's request and so

**2.** Justice O'Connor identified three categories of cases in *Strickland,* —— U.S. at ——, 104 S.Ct. at 2067. The first is "actual or constructive denial of the assistance of counsel altogether," *id.,* in which prejudice is so likely that it is assumed as a matter of law without inquiry into the actual facts of the individual case. *United States v. Cronic,* —— U.S. ——, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), addressed this problem. The second situation involves those cases in which counsel has an actual conflict of interest. Again, prejudice is presumed, provided "the defendant demonstrates that counsel 'actively represented conflicting interests' and 'that an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland,* —— U.S. at ——, 104 S.Ct. at 2067, citing *Cuyler v. Sullivan,* 446 U.S. 335, 350, 348, 100 S.Ct. 1708, 1719, 1718, 64 L.Ed.2d 333 (1980). The final category, the one that will most often arise and that *Strickland* concerned, involves claims of actual ineffective representation.

abrogated Dillon's right to effective assistance of counsel.[3]

We would not reach this conclusion if Fulcher's actions were a subterfuge to gain advantage for his client. But his statements could not have served any trial strategy. The State suggests that Fulcher wanted to force the State into a plea-bargaining situation, because the State needed to try Dillon before it tried his alleged accomplice in order to have Dillon's testimony at the latter's trial. Nowhere does the State demonstrate that its case against the accomplice was so weak that it in fact would have been forced to plea bargain. In fact, much of the physical evidence introduced against Dillon was found in the accomplice's possession or was otherwise connected primarily to him rather than to Dillon (Tr. Vol. VIII at 2005, 2007, 2021, 2032, 2036, 2038). No other evidence to support the State's contention appears in the record, and we reject the argument as implausible. Even if the State would have been forced to plea bargain had the continuance been granted, the belief that an attorney in open court would state that he was incompetent and that he would "take whatever disciplinary action is coming to me for being incompetent, and for doing this to the court and to the State and to the witnesses" (Tr. Vol. III at 638) solely to benefit Dillon by plea bargaining stretches credulity too far.

The trial court was correct in asserting that "it's the court's duty to determine * * * whether an attorney is competent or not to represent a defendant" (id. at 640). The State argues that the number of days between the catastrophic events in Fulcher's life and Dillon's trial minimized the drain inevitably placed on him as he tried to prepare for Dillon's trial. Specifically the State contends that because the divorce was final eighty-nine days before trial, and because Fulcher's father did not die until forty-seven days after trial began (Govt.Br. at 4), those events did not impact on Fulcher's trial preparation. Such reasoning is unduly narrow. Certainly the emotional reverberations the events must have had on Fulcher's concentration and mental and legal acuity merited more than the cursory attention the trial court gave them. Perhaps a divorce eighty-nine days before trial alone would not have affected Fulcher sufficiently for the trial court to consider his claim with care. Perhaps another attorney might not have been so affected. What is crucial is the cumulative effect on Fulcher of the three events—his divorce April 15, 1981, his brother's accident three days later and his father's surgery on July 5, 1981. That the cumulative effect is significant is readily apparent from Fulcher's request on July 7th—only when his father became critically ill, the proverbial last straw, did Fulcher realize how seriously this series of events had compromised his preparation.[4]

---

**3.** The proper focus of course should be on the adversarial process rather than the defendant's assessment of his lawyer's preparation. *United States v. Cronic*, —— U.S. at —— n. 21, 104 S.Ct. at 2046 n. 21, citing *Morris v. Slappy*, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). Consequently, little importance attaches to Dillon's statement that he did not want Fulcher to withdraw (Tr. Vol. IV at 841–842). What is most significant about this exchange is Fulcher's belief that it was required at all. Evidently he felt it was necessary to indicate on the record that Dillon appreciated the significance of what Fulcher had alleged in his affidavit but nevertheless desired Fulcher to continue to represent him, thereby implying a waiver of Dillon's Sixth Amendment right to counsel. If so, then the State's argument that Fulcher filed his affidavit to force the State to plea bargain does not wash. This contention relies on an extraordinary degree of client loyalty. If it were true, then one would think Fulcher would let the alleged error pass, instead of bringing it to the trial court's attention, insisting on the questioning and so possibly allowing Dillon unknowingly to waive his Sixth Amendment right to counsel. Contrary to the belief of the Indiana Supreme Court, see *Dillon v. State*, 454 N.E.2d 845, 847 (Ind.1983), the judge did not question Dillon, and nothing in the record suggests that the judge believed such questioning to be necessary (Tr. Vol. IV at 841–842). The questioning does indicate a very conscientious but inept attorney trying to conduct himself properly but somehow bungling the matter. Interpreted in this light, the exchange between Dillon and Fulcher provides additional evidence of Fulcher's incompetent handling of the trial.

**4.** The State also emphasized in its argument to the trial court that when the State had asked Fulcher in June at a pretrial conference whether he contemplated either withdrawing or ask-

Add to the effect such events would have on any lawyer, regardless how experienced, the fact that Fulcher had been in practice only two and a half years, that this was his first murder case, and that evidently his only prior criminal experience was one "major felony case," and the cavalier attitude of the trial court is even more troubling.[5]

Errors by Fulcher that prejudiced Dillon's trial support Dillon's Sixth Amendment allegation. Contrary to the view of the district court, such errors do exist. The State of Indiana itself identified several such errors in its argument opposing Fulcher's request for a continuance. The State, in illustrating the great amount of preparation it had undergone for this trial that it did not want to see suspended for several months in case the continuance was granted, stated that "there's an immense amount of evidence in this case to go through" (Tr. Vol. III at 634). The State also indicated that Fulcher had been very dilatory about giving Dillon's defenses to the State, that in fact the alibi defense he submitted was barred for not complying with statutory time requirements, and that Fulcher had failed to pursue avenues of investigation that he knew were available (Tr. Vol. III at 634–636).[6] Fulcher also conceded that he had spent less than four hours with Dillon from the time of arrest

to trial (Tr. Vol. I at 6). The State counters this admission with evidence showing that Fulcher visited Dillon 10–15 times in the first jail in which he was imprisoned, and may have visited Dillon in the second jail in which he was confined (*id.* at 12). Even so, the frequency with which Fulcher visited Dillon in jail is not probative of the length of his visits there. Accepting Fulcher's statements regarding the amount of time he had taken to prepare, it is questionable whether he could have done so adequately. The State's own catalogue of Fulcher's deficiencies supports this conclusion (Tr. Vol. III at 634–636). The State may have been right in asserting that granting a continuance would have been "grossly unfair" to the State by possibly forcing it to plea bargain with Dillon, but this argument is irrelevant in the instant situation. Fairness to Dillon, not to the State, is the crux.

Fulcher's lack of preparation evidenced itself at Dillon's trial. To begin, Dillon attempted at Fulcher's recommendation to plead guilty to being an accomplice to the murder, a plea contrary to the facts already admitted into evidence and properly rejected by the trial judge. The prejudice of this defective plea is not measurable, but it surely affected the trial judge's assessment of aggravating and mitigating circumstances.[7] The Supreme Court reiterat-

---

ing for a continuance, Fulcher had said "he didn't know about a continuance," but "he wasn't going to withdraw" (Tr. Vol. III at 633). Perhaps Fulcher should have realized earlier the impact his emotional problems were having on his trial preparation. But that factor does not illuminate whether he really was having those difficulties and to what extent they were affecting his competence. Fulcher's comments indicate that only when his father had emergency surgery did he realize the extent to which the emotional stress he was under had disabled him from preparing adequately (*id.* at 637–638). Even the State had to concede that preparing for a murder trial "is a very strenuous thing to go through" (*id.* at 633).

5. We were advised at oral argument that Dillon's trial was Fulcher's first capital murder case. We also note that appellate counsel advised us at oral argument that their involvement with the case stemmed from their being appointed to assist Fulcher in appealing Dillon's conviction and sentence. This appointment and

Fulcher's subsequent withdrawal from the case provide further evidence of his unfamiliarity with this type of case and his ineffectiveness in providing Dillon competent counsel.

6. In July 1984 Fulcher was disbarred for two years for neglect in prosecuting a case unrelated to the one before us, so that this dilatory pattern of conduct is not new to him. See *In the Matter of Fulcher*, 464 N.E.2d 327 (Ind.1984).

7. At the very least, the trial judge may have viewed the attempted accomplice plea as a calculated attempt to avoid punishment for the crime, and so as evidence that Dillon was in no way repentant. Such an assessment would affect his weighing of aggravating and mitigating circumstances. The only aggravating circumstance was that of the murder's being committed during a burglary, which the judge was to balance against the defendant's lack of any prior criminal history and "[a]ny other circumstances appropriate for consideration." Ind.

ed in *United States v. Cronic*, — U.S. at —, 104 S.Ct. at 2045 n. 19, that "[o]f course, the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no *bona fide* defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." No possible trial strategy could underlie this inappropriate accomplice plea, so that it must have resulted from Fulcher's incompetence.

Even more inexplicably, Fulcher never attempted to plea bargain with the State. Certainly failure to initiate plea-bargaining negotiations is not always error, but in a case in which the State would prefer the defendant's testimony at an accomplice's trial, defense counsel's failure to explore the possibility is inexplicable. Whether or not the State would have regarded the attempt favorably is irrelevant. What is relevant is the strong suggestion of unfamiliarity with the case and lack of preparation that the failure to try to plea bargain shows.

Fulcher's conduct at Dillon's death penalty hearing confirms this suggestion of lack of preparation. The only evidence that Fulcher offered, in addition to that already introduced at trial, was an extremely limited direct examination of the defendant. Fulcher asked Dillon his age, whether he had ever before been in trouble with the law, whether he had intended to kill anyone, and nothing else (Tr. Vol. VIII at 2076–2077). Fulcher offered no character witnesses, either at the trial or at the subsequent death penalty hearing. Surely doing so would be standard practice for an attorney defending an eighteen-year-old with no prior criminal record. Fulcher's almost nonexistent effort to avoid the death penalty once Dillon's guilt was established is incomprehensible and was extremely prejudicial to Dillon.

If Fulcher's omissions and mistakes were "within the wide range of reasonable professional assistance," *Strickland v. Washington*, — U.S. at —, 104 S.Ct. at 2066, given the heavy measure of deference due to counsel's judgment, then we could excuse them. But "all the circumstances," *id.*, indicate otherwise. Dillon's youth and lack of a prior criminal record, the irrevocability of the penalty invoked, Fulcher's own inexperience, and the heavy stress under which Fulcher, by his own admission, was unable to prepare adequately must all be considered. In sum, his errors prejudiced Dillon's trial sufficiently to warrant retrial.[8]

### III

Dillon also appeals the district court's denial of an evidentiary hearing on the issue of effective assistance of counsel. He alleges that the discovery of new evidence compels such a hearing. Specifically, he alleges that his trial counsel had a wager on the outcome of the trial, that he improperly conferred with counsel for the codefendant, and that he never attempted or initiated a plea agreement or informed Dillon of any such agreement. The State concedes that the district court had the authority to hold an evidentiary hearing (Govt. Br. at 18). The only question is

Code § 35–5–2–9 (1982). Given the defendant's youth and lack of any criminal record, assessing the ultimate penalty against him seems overly harsh. The painful deaths of the two victims evidently influenced the trial judge against the defendant, for he refused to consider Dillon's youth on the theory that the "capability of such cruelty in the mind of one that age cannot be considered a mitigating circumstance" (A. 22). This, of course, would particularly be true when the young defendant was unrepentant. We note that if the judge's logic were valid, then age would always work against young defendants convicted of the truly serious crimes for which the death penalty is permitted. The trial judge's statement reveals a misapprehension regarding the purpose of age in mitigating punishment. Judges and juries may consider age in mitigating the death penalty because young defendants have more of an opportunity to change their lives and to correct for one error than those who have more of a history of criminal conduct and are more hardened to the consequences for other people of their criminal acts. Consequently sentencing young adults irrevocably to death may be unfair, a consideration the trial judge refused to adopt.

8. The alleged errors unmentioned in our opinion lack sufficient merit to warrant reversal.

whether 28 U.S.C. § 2254 mandated such a hearing, or if not, whether the district court should have held a hearing anyway.

■ Although the State argues that these assertions constitute issues not raised below and as such are barred from consideration on habeas review, see *Williams v. Duckworth*, 724 F.2d 1439, 1442 (7th Cir.1984), the district court correctly held that the allegations represent merely "sub-issues" of the main issue (Mem. Order of April 20, 1984). In *Williams* the issue of effective representation of counsel was not raised at all in the state court proceedings. Dillon has raised this issue; now he merely wants to add additional substance to his allegations. Because Dillon knew the facts on which he bases his allegations prior to his filing for post-conviction relief, the evidence he cites is not of a character which would justify an evidentiary hearing. *United States* ex rel. *Barksdale v. Sielaff*, 585 F.2d 288, 293 n. 4 (7th Cir.1978), certiorari denied, 441 U.S. 962, 99 S.Ct. 2409, 60 L.Ed.2d 1067 (1979).

Contrary to what Dillon alleges, *Strickland v. Washington*, *supra*, did not establish new standards for evaluating Sixth Amendment ineffective assistance of counsel claims that would require a hearing. *Strickland*, —— U.S. at ——, 104 S.Ct. at 2069. *United States* ex rel. *Cosey v. Wolff*, 682 F.2d 691 (7th Cir.1982), is also not to the contrary. *Cosey* involved a claim of ineffective assistance of counsel, in which this Court held that the "targeted counsel, if at all available, should be called and given the opportunity to meet and refute the serious charges made against him." *Id.* at 693. But in this case Fulcher is not available and probably would not become available. Moreover, he has already been heard from in the form of the affidavits he filed before trial and subsequent to trial, in which he admitted his own incompetence. Presumably he would not now repudiate those affidavits and so

therefore would be unable to refute the charges against him. Moreover, in *Cosey* the charge of incompetence—that certain exculpatory witnesses were not interviewed or called by the defending attorney—could be explained as a part of counsel's trial tactics, since three of the five potential witnesses were biased because of their relationship to the defendant and the attorney could have believed that their testimony would be false. *Id.* at 693–694. No such explanation or possible trial strategy exists here. Consequently, the concern in *Cosey* that attorneys might be accused without an opportunity to defend themselves is absent. The district court's denial of an evidentiary hearing was proper.

## IV

■ Dillon's final allegation concerns the trial court's imposition of the death sentence. Indiana has a bifurcated system in which guilt is assessed at the first stage and the sentence is determined at the second, a process similar to that upheld by the Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Dillon alleges that the trial judge did not himself specifically find that the State had proved beyond a reasonable doubt each of the facts necessary to impose the death penalty. This allegation is patently false, as the Supreme Court of Indiana made clear in *Dillon v. State*, 454 N.E.2d 845, 852–854 (Ind.1983). The trial judge stated that "the court finds beyond a reasonable doubt that the aggravating circumstances * * * outweigh the mitigating circumstance" (quoted in *id.* at 854).[9] We therefore affirm the district court finding that the trial judge's findings comported with the Indiana death penalty statute.

The writ of habeas corpus is granted and defendant will be released unless the case is retried within the next 90 days.

---

9. We agree with the district court that the dissenting justices were "pleading for clearer findings by the state's trial judges, but * * * such is a matter of form more than substance" (Mem. Order of June 21, 1984), especially in light of the trial court's explicit statement, in our eyes, that he had found each factor beyond a reasonable doubt.